Filed 5/28/15  In re Jeremiah H. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JEREMIAH H., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DIEGO R.,<br><br>Defendant and Appellant. | F069958<br><br>(Super. Ct. No. 12CEJ300136-2)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Martin Suits, Commissioner.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Amy K. Cobb, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Diego R. (father) appeals from orders of the juvenile court denying his Welfare and Institutions Code section 388[1] modification petition and terminating his parental rights over his son Jeremiah H. at a hearing held pursuant to section 366.26.  Father contends the juvenile court erred in denying his section 388 petition because he proved changed circumstances such that it would be in Jeremiah's best interest to reinstate reunification services.  He also contends he had a beneficial relationship with Jeremiah that should have prevented termination of his parental rights pursuant to section 366.26, subdivision (c)(1)(B)(i).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Jeremiah, then 16 months old, came to the attention of the Fresno County Department of Social Services (department) on October 23, 2012, when he was found with father and F.H. (mother)[2] in a small apartment filled with marijuana smoke.  Father admitted he had just been smoking marijuana and had used methamphetamines and marijuana for the past two days.  Mother, who was pregnant, disclosed recent methamphetamine use and stated that she used nearly every day.  Mother and father did not live together and mother reported that she was afraid of father and that she had recently called the police twice because of father's behavior.  According to father, he was awarded sole legal and physical custody of Jeremiah in September of 2012.  Mother had a child welfare history involving other children; father had previous referrals to the department involving Jeremiah that were deemed inconclusive.  Father had a lengthy criminal history dating back to 2002, which included grand theft, petty theft, robbery, burglary, possession of a controlled substance, disorderly conduct, illegal possession of a firearm, a DUI, gang participation, and corporal injury to a spouse or cohabitant.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2]    Mother is not a party to this appeal.

The department filed a section 300 petition alleging that Jeremiah was at serious risk of harm due to mother and father's substance abuse problems.

*Detention*

At the detention hearing October 26, 2012, the juvenile court found prima facie evidence to detain Jeremiah from mother and father's care. Father was to be offered services for substance abuse and treatment, drug testing, mental health evaluation and treatment, and parenting and domestic violence classes. Mother and father were to visit Jeremiah separately and their visits were to be supervised.

*Jurisdiction*

The November 20, 2012, report prepared in anticipation of jurisdiction stated that father was not yet participating in the case plan. Between October 29 and November 14, 2012, father tested positive for marijuana on three occasions and missed three drug tests. Father visited Jeremiah regularly and the visits went well.

At the jurisdiction hearing held December 11, 2012, father submitted on the report. The juvenile court sustained the petition and Jeremiah was detained.

*Disposition*

The February 7, 2013, report prepared in anticipation of the disposition hearing stated that Jeremiah had been placed with a maternal great aunt and uncle. Mother and father, who had been in an on and off relationship for two years, were no longer together. Prior to detention, Jeremiah resided primarily with father, although mother maintained regular contact with him. Father was living with his mother and had begun participating in a parenting program. According to father, he began using drugs at age 13 and continued to use regularly.

Father entered a residential substance abuse treatment program, Comprehensive Addiction Program (CAP), on January 23, 2013. He was also attending anger management classes and AA/NA meetings. He visited Jeremiah regularly and interacted

appropriately with him. Father had not attended a scheduled mental health evaluation. Mother, who was now four months pregnant, continued to use drugs.

At the February 7, 2013, disposition hearing, father was found to be Jeremiah's presumed father. Father submitted on the report and Jeremiah was removed from mother and father's care. Reunification services were ordered for father.

*Six-Month Review*

The August 1, 2013, report prepared in anticipation of the six-month review hearing recommended that reunification services be continued for mother and father. By this time, mother had a newborn, N.; father was found not to be N.'s biological father.

Father was reported to have successfully completed substance abuse inpatient treatment at CAP in April of 2013; he also completed a parenting course while there. He then enrolled in a sober living facility, but left because he was not getting along with his roommate. He continued to participate in aftercare services. Although father had only three sessions left to complete in aftercare, his instructor worried about the negative influence of father's family. Father eventually moved back into his mother's home. Father was participating successfully in therapy and his therapist believed his symptoms were "gone." Father completed nine sessions of the 52-week batterer's treatment program and was making satisfactory progress. He tested negative on all of his random drug tests, but he also missed six tests, which he claimed was due to his busy schedule.

Father visited Jeremiah regularly three to four days a week for a minimum of two hours each visit. Father was progressing from unsupervised to liberal visitation. He exhibited proper parenting skills, and applied what he had learned in his parenting course while interacting with Jeremiah. The department believed the prognosis for reunifying Jeremiah with father was strong.

The juvenile court ordered further reunification services for father.

## 12-Month Review

The December 5, 2013, report prepared in anticipation of the 12-month review hearing recommended reunification services be terminated for both mother and father. Jeremiah remained with his maternal great aunt and uncle; half sibling N. was placed in the same home.

According to the report, father was terminated from the batterer's treatment program and counseling services in July of 2013 for excessive unexcused absences. He also missed numerous drug tests. The department lost contact with father for about a month until September 2013 when father reported that he had relapsed. Father blamed his relapse on a new relationship. He stopped visits with Jeremiah during this time as well. Father was again referred for drug treatment. He participated in an initial intake assessment at the end of September 2013, but failed to follow through, this time claiming he was working. Father failed to participate in drug treatment until November 2013, when he was once again referred to a residential program.

At the January 23, 2014, contested 12-month review hearing, father testified that he was scheduled to complete the 90-day treatment program on February 2, 2014. He was retaking anger management and parenting classes. He began supervised weekly visits with Jeremiah again in September of 2013. According to father, he had last had unsupervised visits with Jeremiah in August of 2013 and he then "lost contact" with the department because he was using drugs. Father testified that he began treatment and classes again after he realized how important it was for him to be a father to Jeremiah. Father testified that his sobriety made him aware of how important Jeremiah was and he was thankful for the department's intervention.

On cross-examination, father acknowledged that, when he had unsupervised visits with Jeremiah in July and August of 2013, he missed numerous sessions with Jeremiah and his speech coach -- sessions he testified on direct examination that he had attended

5.

regularly. He also admitted on cross-examination that he had been using drugs while Jeremiah was in his care during unsupervised visits.

The juvenile court went over father's case history at length, finding that father's progress, while significant, was too late. As stated by the juvenile court, father was "[g]iven entitlement and second chance to get it right and he didn't. He didn't get it right until November 1, 2013 and since that time he's been getting it right like crazy but it looks to be too little too late .…" The juvenile court noted that father had still not advanced beyond supervised visitation, he had not yet begun his batterer's treatment program, and he was not yet done with inpatient treatment and would then need to do aftercare. The juvenile court terminated reunification services, finding that it could not extend services to the 18-month stage. A section 366.26 termination hearing was set for May 23, 2014.

On January 29, 2014, father filed a notice of intent to file writ petition, which was later dismissed as abandoned on March 19, 2014.

*Section 388 Modification Petition*

On May 12, 2014, father filed a section 388 modification petition seeking an order reinstating reunification services and/or providing family maintenance services. In the petition, father stated that he had completed drug treatment, completed aftercare, continued to consistently test clean, and completed two anger management and parenting classes, and was "in the process of" enrolling in a 52-week batterer's treatment program. He was enrolled in a Celebrate Families class at CAP, a 24/7 Dad's Class, and a Love Notes class at POPS, he was employed, and had been sober since November 4, 2013.

The department submitted a May 21, 2014, response to father's section 388 petition and recommended the petition be denied.

*Combined Sections 366.26 and 388 Hearing*

The May 15, 2014, report prepared in anticipation of the section 366.26 hearing recommended that father's parental rights be terminated. Father, who was living with his

mother, was "very consistent" in visiting Jeremiah. During supervised visits, father fed, changed and bathed Jeremiah, he read to him and he played and colored with him. At times, father took Jeremiah to visit his cousins.

In April of 2014, the social worker supervised three of father's visits. During these visits, father was very attentive to Jeremiah, he spoke to him in a calm and pleasant voice, they played hide and seek together, and Jeremiah followed father's instructions. Father praised and complemented Jeremiah. Father stated he enjoyed watching Jeremiah's developmental progress during visits together.

On August 12, 2014, the department submitted another response to father's section 388 petition and again recommended the petition be denied. Father's visits with Jeremiah were appropriate and loving and father consistently tested clean. And while the department admitted father completed both the inpatient and outpatient drug programs, he had not done so within the reunification time frame and he had "not demonstrated the ability to maintain a significant amount of time of sobriety."

The combined contested sections 366.26 and 388 hearing took place on August 21, 2014. Father's aunt, Patricia G., testified that father had had no interest in working when he was using drugs. Now that he was clean, he worked and was more responsible. Patricia G. observed father interact with Jeremiah at monthly family get-togethers. Patricia G. thought Jeremiah was very bonded to father and he appeared sad at the end of the visits. She believed Jeremiah would suffer negative consequences if his relationship with father was terminated.

Father testified that, although he had relapsed in July of 2013, he had been sober since November 4, 2013. He completed two 90-day inpatient programs, as well as anger management and an aftercare program. Father consistently tested clean. Father described his visits with Jeremiah and believed his bond with him was "really, really deep." Father believed Jeremiah would be harmed if he did not have a relationship with

7.

him.  Father had researched how children who grow up without fathers were more likely to be involved in gangs, criminal activity, drinking and they had a higher suicide rate.

When father was asked why he believed it was in Jeremiah's best interest to have a continued relationship with him, father said:  "He's my only son.  He would be my main focus and everything that he deserves and needs with the change is [*sic*] that I'm making now and the responsibility that I have that I've gained, … just being responsible now and he's my main focus.  I would give him whatever he needs right now."

As to the section 388 motion, counsel for the department did not think it was in Jeremiah's best interests to reinstate reunification services as Jeremiah had been in his current placement with his half sister "[m]ost of his life."  As for termination of parental rights, counsel for the department and counsel for Jeremiah both argued that father had not demonstrated that the parent/child relationship outweighed the benefits of adoption for Jeremiah

The juvenile court found Jeremiah to be adoptable by clear and convincing evidence and that adoption was the appropriate plan.  The juvenile court terminated father's parental rights.  The juvenile court then denied father's section 388 petition.

**DISCUSSION**

I.       SECTION 388

Father contends that the juvenile court abused its discretion when it denied his section 388 request for reinstatement of reunification services.  In father's view, the evidence established he had made significant changes in his sobriety and it was in the child's best interest to reinstate reunification services to allow him a further opportunity to develop and maintain a relationship with Jeremiah.  We disagree.

Family reunification services play a critical role in dependency proceedings.  (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563.)  When a child is removed from the physical custody of his or her parent, the juvenile court is required, with limited exceptions, to offer or provide reunification services to the child's parents.  (§ 361.5,

8.

subd. (a).)  Reunification services for a parent of a child under three years of age at detention may be limited to six months if the parent has not participated regularly and made substantial progress in a court-ordered case plan and there is not a substantial probability that the child may be returned to his or her parent by the 12-month review hearing.  (§§ 361.5, subd. (a)(1)(B), 366.21, subd. (e).)  Here, father was given 12 months of reunification services before the juvenile court terminated them.

Under section 388, a parent or any interested person may petition the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence.  (§ 388, subd. (a)(1).)  The petitioner requesting modification has the burden to show, by a preponderance of the evidence, that there is "a change of circumstance or new evidence, *and* that the proposed modification is in the child's best interests."  (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445; § 388, subds. (a)(1), (d); *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416 (*Jasmon O.*).)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster case is in the best interest of the child.  [Citation.]"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)  In determining whether the modification is in the child's best interest, the juvenile court should consider a number of factors, including: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532 (*Kimberly F.*).)  This list is not meant to be exhaustive.  (*Ibid.*)  In addition, "a petition which merely alleges *changing* circumstances and would mean delaying the selection of a permanent home for a child … does not promote stability for the child or the child's best

9.

interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47 (*Casey D.*).) "'Specific allegations describing the evidence constituting the proffered changed circumstances or new evidence' is required. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) In ruling on the petition, the juvenile court may take into account the entire record, not just the allegations of the petition and supporting attachments. (Cf. *In re Angel B.* (2002) 97 Cal.App.4th 454, 463.)

On appeal, we will not disturb the juvenile court's ruling on a section 388 petition absent a clear abuse of discretion. (*Jasmon O., supra,* 8 Cal.4th at pp. 415-416.) "'"When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court."'" (*Stephanie M., supra,* 7 Cal.4th at p. 319.)

On appeal, father argues that in denying his motion, the juvenile court abused its discretion because, between January 23, 2014, when reunification services were terminated, and August 21, 2014, when the section 388 hearing was heard, he had shown considerable and significant changed circumstances. As argued by father, in that time period, he had completed drug treatment and aftercare, consistently tested clean, completed another parenting and anger management class, he was working and he was participating in several support groups. Father also contends he has a strong argument that reinstatement of reunification services would be in Jeremiah's best interests because he had become an "outstanding father" and was able to apply the parenting techniques he had learned during his frequent and extended visits with Jeremiah.

As to evidence of changed of circumstances, while father presented evidence that he had completed a drug treatment program in February of 2014, and aftercare in April of 2014, participated in drug testing, completed a parenting class and anger management class, and was enrolled in various support groups, these efforts were all too short in duration when weighed against father's history of drug abuse and relapse to warrant granting the relief father sought in the petition. Here, as the juvenile court observed,

10.

father had a long history of drug abuse - according to father he had been using drugs since he was 13 years old; he is now 30. The evidence before the juvenile court was that, during the pendency of the case, father completed drug treatment and relapsed shortly thereafter. When he again completed drug treatment, including aftercare, in April of 2014, it was only one month before he filed the section 388 petition and four months before the hearing on the petition.

Father simply does not have a sufficient track record of effectively addressing his drug abuse issues. At most, father's recent sobriety shows that he was attempting to address the issue and was in the process of changing. However, evidence of "changing" circumstance is insufficient to obtain relief under section 388. (*Casey D., supra,* 70 Cal.App.4th at p. 47.) Even a showing of great effort to make improvements will not necessarily be persuasive when a parent has an extensive history of drug use. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [affirming the denial of a section 388 petition when the parents' efforts at drug rehabilitation were only three months old at the time of the section 366.26 hearing]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 205-206 [mother's very recent treatment for drug abuse and bipolar disorder was not even a prima facie case of changing circumstances]; *Casey D., supra,* 70 Cal.App.4th at pp. 47-48 [affirming denial of a section 388 petition when mother with an extensive history of drug use had been drug free for only a few months and had not completed her treatment program].) Thus, the juvenile court was well within its discretion in determining father's recent correction of the behaviors leading to the dependency action constituted "changing" rather than "changed" circumstances.

In addition, father did not demonstrate that reinstatement of reunification services was in Jeremiah's best interests. It is clear that father and Jeremiah shared a bond and enjoyed regular supervised visits. However, the evidence presented to the juvenile court was that, while Jeremiah appeared to enjoy time with father, he had a strong sibling relationship with N. in the home of his maternal great aunt, where he was doing well. His

great aunt wished to adopt both Jeremiah and N. At the time of the section 388 hearing, Jeremiah was barely three years old and had been out of father's care for almost two years. Father's proposed modification would have kept Jeremiah's case open for at least another six months, even though Jeremiah's caregivers were willing to adopt him.

"[M]ost basic," "the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem" (*Kimberly F. supra,* 56 Cal.App.4th at p. 532), also favors denial of father's section 388 petition. As chronicled above, father had a lengthy drug abuse history, he was provided treatment and relapsed shortly thereafter, and was slow to reenter treatment, which he finally did in November of 2013 and just recently completed in April of 2014. Because of this issue, father was not able to progress in visitation and take on greater caretaking responsibility for Jeremiah, even though he was given an additional six months of reunification services to do so at the six-month review hearing. "'[C]hildhood does not wait for the parent to become adequate.'" (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

Having reviewed the record as summarized above, we conclude the juvenile court properly exercised its discretion by denying father's section 388 request.

II.     SECTION 366.26, SUBDIVISION (c)(1)(B)(i)

Father also contends the juvenile court erred when it failed to consider his argument that the beneficial parent-child relationship exception applied to prevent termination of his parental rights. Father contends that he made this argument in writing prior to trial and addressed the issue during testimony and in closing argument, but the juvenile court failed to consider and failed to make a finding with respect to this challenge. We disagree.

Section 366.26 requires the juvenile court to terminate parental rights and select adoption as the permanent plan for a child who cannot be returned to parental custody and who is likely to be adopted, unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One exception is at issue here, namely that parental rights should not be

12.

terminated where "termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "'[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce the evidence.' [Citation.]" (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).)

*Procedural Background*

Here, in a statement of contested issues filed on June 6, 2014, in anticipation of the combined sections 366.26 and 388 hearing, father stated that he planned to show changed circumstances to have Jeremiah placed with him or to resume reunification services. If the request was denied, father would then "argue that Jeremiah has such a bond with him that it would be detrimental to sever that bond in order for Jeremiah to be adopted." He repeated the same statement in an amended statement of contested issues filed August 4, 2014.

At the August 12, 2014, confirmation hearing, father's counsel stated he was going to eliminate one witness from the witness list and have another witness, father's aunt Patricia G., testify to father's "relationship with the child and any detriment that we can show on breaking that relationship by adoption." The juvenile court noted that was an "important scope to go into," and set the combined hearing for August 21, 2014.

At the combined hearing August 21, 2014, father's counsel called Patricia G., who testified to father's change since he was sober and his relationship with Jeremiah, which she described as "good." She testified that Jeremiah liked to follow father around, that father was teaching him his letters and numbers, that Jeremiah "gets happy" when he sees father, and that he got sad when he has to leave father.

When the juvenile court questioned what counsel was attempting to do in questioning Patricia G., counsel stated she was "trying to show the beneficial relationship and that there's changed circumstances in the best interest of the child." The juvenile

court expressed skepticism, stating that if counsel was trying to state that father "has a substantial relationship with the child [who] was taken at one year's old and he's now three year's old two years later you're stretching my credibility pretty substantially.… [I]t is completely unbelievabl[e], period.… [¶] … [¶] And my understanding [is that] … for a long portion of that time he wasn't even visiting the child."

The juvenile court then allowed father's counsel to continue along that line of questioning, allowing Patricia G. to explain that she was able to observe father and Jeremiah together during visits because the visits took place at her sister's. When father's counsel asked Patricia G. whether she thought father and Jeremiah were bonded, Patricia G. was allowed to answer over objection from counsel for the department.

Father then testified, in part, to his relationship with Jeremiah, stating that they had a "really, really deep" bond, that Jeremiah looked forward to seeing him, that Jeremiah was unhappy when he left, that Jeremiah did not want to do anything without him, and that Jeremiah would be harmed by not having a relationship with him. When asked why father thought it would be in Jeremiah's best interest to continue his relationship with him, father stated that Jeremiah was his "main focus."

In closing, father's counsel argued she had "tried to show that there's a beneficial relationship that sounds like it would be detrimental for Jeremiah to break that bond .…" Counsel cited testimony that father and Jeremiah played together, that Jeremiah would lay his head on father's shoulder and that father kept Jeremiah in touch with his extended family, all things counsel stated she believed fell within the "beneficial relationship."

Counsel for the department argued that father and Jeremiah's relationship did not amount "to the level of a compelling reason to not terminate." Instead, counsel asked the juvenile court to proceed with adoption by the maternal great aunt and to maintain the relationship between Jeremiah and his half sibling, who also resided there. Counsel for Jeremiah also stated that she did not feel that the benefit of the "parent/child relationship outweighs the benefit of adoption."

14.

The juvenile court noted that Jeremiah had spent "a fair amount of time with the maternal relatives" prior to being detained, and that had been a "stabilizing influence his entire life." Before terminating father's parental rights, it stated that it had read and considered the report and that there was clear and convincing evidence that Jeremiah would be adopted, and that adoption was the appropriate permanent plan.

Thus, while the juvenile court did not specifically mention the parent-child beneficial relationship exception in its ruling, at no time during the course of the hearing did it refuse to allow evidence or make any statement or even insinuate that it would not consider or allow father's evidence or argument on that issue. With that in mind, we will address father's argument whether the juvenile court abused its discretion in failing to find a beneficial parent-child relationship exception to termination of his parental rights.

*Standard of Review*

We affirm the juvenile court's factual findings if they are supported by substantial evidence. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm if the order is supported by substantial evidence even if other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

In addition to making factual findings, however, the juvenile court is required to balance the benefit a child derives from maintaining parental relationships against the benefit he or she derives from being adopted. Here, the juvenile court struck that balance in favor of adoption. We review that portion of its order under the deferential abuse of discretion standard. As the court noted in *Bailey J.*, this is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the [parental] relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of

15.

adoption.  [Citation.]  Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."  (*Bailey J., supra,* 189 Cal.App.4th at p. 1315.)

*Beneficial Parental Relationship*

"To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination."  (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.)  A beneficial relationship "is one that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [(*Autumn H.*)].)  The existence of this relationship is determined by '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'  (*Id.* at p. 576.)"  (*In re Amber M.* (2002) 103 Cal.App.4th 681, 689.)

Overcoming the statutory preference for adoption and avoiding the termination of parental rights requires the parent to show both that he or she maintained regular visitation with the child and that the child would benefit from continuing the relationship.  (§ 366.26, subd. (c)(1)(B)(i).)  "Sporadic visitation is insufficient to satisfy the first prong" of the exception.  (*In re C.F., supra,* 193 Cal.App.4th at p. 554.)  Satisfying the second prong requires the parent to prove that "severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.  [Citations.]  A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent."  (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.)  Evidence that a parent has maintained "'frequent and loving contact' is not sufficient to

establish the existence of a beneficial parental relationship." (*Bailey J., supra,* 189 Cal.App.4th at pp. 1315-1316.)

Here, the evidence before the juvenile court does not support a finding in favor of a beneficial parent-child relationship. As for the first prong, there was evidence before the juvenile court that father did visit Jeremiah fairly regularly. But there was a significant period of time when father relapsed during reunification and missed visits and appointments with Jeremiah. In addition, the visits were primarily supervised, with a short stint of unsupervised and "liberal" visits a year earlier.

As for the second prong, we find that the evidence does not support a finding that father shared a relationship with Jeremiah that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) In determining whether the beneficial parent-child relationship exception applies, the juvenile court takes into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs .…" (*Id.,* at p. 576.) "'Interaction between natural parent and child will always confer some incidental benefit to the child[,]'" but that is insufficient to meet the standard. (*In re C.F., supra,* 193 Cal.App.4th at p. 555, quoting *Autumn H., supra,* at p. 575.) "[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra,* at p. 575.)

There is substantial evidence to support the juvenile court' finding that Jeremiah would benefit more from the permanency of adoption than he would from maintaining a legal relationship with father. Although father was appropriate with Jeremiah during visits, and shared a positive relationship, there was nothing to indicate that Jeremiah had

"a substantial, positive emotional attachment" to father, or that he would be greatly harmed if that relationship was severed. (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

Father emphasizes that he had custody of Jeremiah before he was detained at 16 months. But the juvenile court must consider the strength of the parent-child relationship as it exists at the time of the section 366.26 hearing, not at the time of the initial detention. (*In re C.F., supra,* 193 Cal.App.4th at p. 557.) At the time of the section 366.26 hearing, Jeremiah was a little over three years old and had not lived with father for almost two years. Jeremiah was happy and secure, living with his maternal great aunt and uncle and he looked to them for all his needs.

Father compares the facts of his case to those in *In re S.B.* (2008) 164 Cal.App.4th 289, in which the court concluded the juvenile court erred in declining to apply the beneficial parent-child relationship exception. (*Id.* at pp. 300-301.) In *S.B.*, the child was five years old, the appellant father had been her primary caretaker for three years, she displayed a strong attachment to father, and he had "complied with 'every aspect' of his case plan." (*Id.* at pp. 293, 298, 300-301.) Here, father was given sole custody of Jeremiah just a month before he was detained; Jeremiah had been out of father's custody for more than half his life; and Jeremiah had developed a significant bond with his maternal great aunt, whom he had spent significant time even before being detained. In addition, father was slow to participate in his reunification plan. Once he did, while in the middle of reunification, he relapsed, cut off visits with Jeremiah and had to start again, further delaying reunification. He had, at the time of the section 366.26 hearing, been out of drug treatment for just four months.

Jeremiah deserved to have his custody status promptly resolved and his placement made permanent and secure. Given all of the facts of this case, we conclude the juvenile court did not abuse its discretion in failing to find that a beneficial parent-child relationship existed and in terminating father's parental rights.

18.

**DISPOSITION**

The orders are affirmed.

_____
FRANSON, J.

WE CONCUR:


_____
KANE, ACTING P.J.


_____
DETJEN, J.